UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jane C. Hayes-Broman,

       Plaintiff,

v.                                     Civil No. 09-3015 (JNE/JJG)
                                           ORDER

J.P. Morgan Chase Bank, N.A.,
Federal Deposit Insurance Corporation
as receiver for Washington Mutual Bank,
F.A., Aaron McCann, Felicia McCann,
Vulcan Recoveries LLC, Northern Realty
Ventures LLC, Edina Realty Title, Inc., f/k/a
Equity Title Services, Inc., C&M Real Estate
Services, Inc., and First Minnesota Bank,

       Defendants.

---

Michael T. Kallas, Esq., Kallas & Associates, Ltd., appeared for Plaintiff Jane C. Hayes-Broman.

Eric D. Cook, Esq., Wilford & Geske, PA, appeared for Defendants J.P. Morgan Chase Bank, N.A., and the Federal Deposit Insurance Corporation as receiver for Washington Mutual Bank, F.A.

John G. Westrick, Esq., Westrick & McDowall-Nix, PLLP, appeared for Defendants Aaron McCann, Felicia McCann, Vulcan Recoveries LLC, and Northern Realty Ventures LLC.

Jack E. Pierce, Esq., Pierce Law Firm, PA, appeared for Defendant C&M Real Estate Services, Inc.

Thomas B. Olson, Esq., Olson & Lucas, PA, appeared for Defendant First Minnesota Bank.

---

Plaintiff Jane C. Hayes-Broman's home was sold at a foreclosure sale on April 6, 2006,

to Washington Mutual Bank, F.A. (WaMu), the mortgagee. This litigation arises from the

actions of Plaintiff and WaMu during the redemption period; the real estate prospecting of

Northern Realty Ventures LLC (NRV), Vulcan Recoveries LLC (Vulcan), and C&M Real Estate

Services, Inc. (C&M); and WaMu's failure, the Federal Deposit Insurance Corporation's (FDIC)

appointment as WaMu's receiver, and the purchase of the majority of WaMu's assets and certain

of its liabilities by J.P. Morgan Chase Bank, N.A. (Chase). The matter is before the Court on

Plaintiff's and First Minnesota Bank's (First Minnesota) motions for summary judgment and the

joint motion for summary judgment of the FDIC and Chase. For the reasons discussed below,

the Court grants Plaintiff's motion, denies First Minnesota's motion, and grants in part the joint

motion of the FDIC and Chase.[1]

## I.    BACKGROUND

A certificate of title identified Felicia and Aaron McCann as the fee simple owners of

property legally described as Lot 13, Block 4, Mattock Park, Ramsey County, Minnesota

(Property). On January 29, 1993, Plaintiff executed a contract for deed with the McCanns to

purchase the Property. The contract for deed required the McCanns to "execute, acknowledge

and deliver" a warranty deed to Plaintiff upon her "prompt and full performance" of the contract.

Under the terms of the contract for deed, Plaintiff paid $8,157.65 at the time it was executed, was

required to pay $7,918.59 in monthly installments to the McCanns by March 15, 1995, and

agreed to assume and pay the existing mortgage of $84,923.76.[2] Plaintiff assumed the mortgage

in an agreement (Assumption Agreement) between her, the McCanns, and WaMu's predecessor

in interest. The Assumption Agreement did not relieve the McCanns from liability on the

mortgage. Although Plaintiff paid deed "recording fees" to Edina Realty Title, Inc., f/k/a Equity

---

[1]     The McCanns, NRV, and Vulcan jointly filed a late motion for summary judgment concurrent with their memorandum in opposition to Plaintiff's motion for summary judgment. They provided no justification for the late-filed motion, and the Court denies it as untimely filed. *See Allstate Prop. & Cas. Ins. Co. v. Myllykangas*, 504 F. Supp. 2d 596, 603 (D. Minn. 2007) (refusing to consider late-filed motion for summary judgment). Additionally, although counsel for C&M appeared at the hearing on the parties' motions, C&M filed no responses to the various motions.

[2]     The contract for deed provided for a total purchase price of $100,000. The sum of the initial payment, the monthly payments, and the mortgage identified in the contract for deed, however, total $101,000.

Title Services, Inc. (Edina Realty), the contract for deed was not registered with Ramsey County on the Property's certificate of title. Plaintiff completed the monthly payments required by the contract for deed in 1995. In June 1996, the McCanns executed and delivered a warranty deed to Plaintiff for the Property.[3] Plaintiff did not register the warranty deed. At all times relevant to this case, Plaintiff paid the property taxes and insurance for the Property. Ramsey County tax records, however, identified the McCanns as the taxpayers on the Property through 2006.

Plaintiff continuously resided on the Property from January 1993 until June 2004. In June 2004, Plaintiff's employer sent her to England for what she expected to be a temporary three-month assignment. The assignment lasted until August 2008, during which time Plaintiff's employer leased and paid for Plaintiff's residence in England. Although her employer considered her to be an expatriate during her time in England, Plaintiff regularly returned to Minnesota and resided on the Property. For example, according to summaries maintained by Plaintiff's employer, she was in Minnesota for 57.5 days in 2005, 49.5 days in 2006, and 44 days in 2007. Plaintiff kept personal belongings—including her furniture, clothing, toiletries, cleaning supplies, household goods, automobile, family photographs, family heirlooms, books, and music—at the Property. Plaintiff maintained all utilities for the Property in her name, listed her name in directory assistance with the Property designated as her address, and did not have her mail regularly forwarded to England. During her absence, Plaintiff allowed her adult niece to reside on the Property rent free and without a lease agreement.

---

[3]     When the warranty deed was produced during Plaintiff's deposition, she indicated that she could not recall having previously seen the document and that she did not remember it coming from her records. Later in the same deposition, Plaintiff was again asked if she had ever seen the warranty deed. Plaintiff responded: "If this is the document I found in my house and gave to [my attorney], then yes. If it's not, then no." In fact, Plaintiff had produced the warranty deed with a handwritten letter from Felicia McCann confirming the delivery of the deed. Plaintiff later clarified by affidavit that at the time of her deposition she did not recognize the document as the warranty deed.

Plaintiff received eight separate notices of mortgage foreclosure by WaMu and its predecessor between 1996 and 2004. On January 4, 2005, Plaintiff brought her mortgage current with a payment of $13,057.98. Thereafter, Plaintiff missed several monthly mortgage payments in 2005. On January 19, 2006, WaMu referred the mortgage on the Property to counsel to institute foreclosure proceedings. WaMu received a check for $3,086.31 and a check for $1,028.77 from Plaintiff in February 2006. WaMu returned the payments within days by issuing checks in the same amount to Plaintiff. Plaintiff never cashed those checks.[4] On April 6, 2006, WaMu purchased the Property at a foreclosure sale for $66,400.16. Nevertheless, WaMu accepted payments on the mortgage from Plaintiff on four occasions between April 2006 and August 2006 without timely returning the payments.[5]

While Plaintiff was at the Property on September 4, 2006, she was approached by Joe Yurecko, a representative of NRV, who offered to purchase the Property. Plaintiff declined Yurecko's offer. Yurecko also informed Plaintiff that the Property had been sold at a foreclosure sale on April 6, 2006, and that she had until October 6, 2006, to redeem the sale.[6] Plaintiff contacted WaMu and was told that her only recourse was to redeem the Property by October 6, 2006. Plaintiff could not obtain the funds by that date. However, she negotiated with WaMu through her counsel to permit her to repurchase the Property by October 11, 2006, subject to "the

---

[4]     WaMu sent checks for the same amount to Plaintiff in October 2006. Plaintiff again did not cash the checks.

[5]     An email exchange between Plaintiff and a WaMu representative indicates that these payments had not been returned as of September 29, 2006.

[6]     Plaintiff's knowledge of her default and the foreclosure sale before her conversation with Yurecko is disputed.

redemption rights of a junior lien holder if there were any."[7]  Plaintiff wired the required

payment to WaMu on October 11, 2006.  Ordinarily, this would have ended the matter.  As

discussed below, however, the real estate prospecting of NRV, Vulcan, and C&M resulted in the

present situation.

On October 2, 2006, the McCanns quitclaimed their interest in the Property to NRV,

agreeing "to convey and transfer [the Property] without warranty or title of any kind."[8]  NRV

registered the quit-claim deeds two days later, which canceled the certificate of title identifying

the McCanns as the fee simple owners of the Property and replaced it with a new certificate of

title identifying NRV as the fee simple owner of the Property.  NRV then granted a mortgage on

its interest in the Property to Vulcan, a company related to NRV, for $120,000.  On October 6,

2006, Vulcan registered the mortgage and its notice of intent to redeem the Property as a

subsequent mortgage holder.  This gave Vulcan one week to redeem the Property.  On October

11, 2006, Vulcan redeemed the Property for $74,113.13, and the Ramsey County Sheriff issued a

certificate of redemption.[9]  As a result, WaMu informed Plaintiff on the same day that it would

---

[7]     On October 5, 2006, Plaintiff's counsel sent a letter to WaMu's counsel confirming the October 11 deadline and enclosing a copy of Plaintiff's Notice of Unregistered Interest. Plaintiff, however, never registered the Notice of Unregistered Interest on the Property's certificate of title.

[8]     The transaction agreement states:

In return for said quit-claim deed from the grantors, the grantee is hereby obligated to pay to each grantor, $10,000 in certified funds, should the above described real property be successfully redeemed by [NRV] on or before October 30, 2006.  Within 60 days upon a successful redemption, [NRV] shall be liable for said payments to the grantors.  However, should litigation arise on the property within the 60 day period, [NRV] shall not be obligated to pay the above amount until and unless it is the prevailing party in the litigation.

[9]     The certificate of redemption is dated October 11, 2006.  Inexplicably, a letter from the Ramsey County Attorney's Office, also dated October 11, 2006, indicates:

be unable to "assign the Sheriff's Certificate to [Plaintiff]." Within days, Vulcan sold its interest in the Property to C&M via quit-claim deed for $230,000. The transaction agreement noted that C&M "is expressly on notice that litigation . . . may arise on the [Property] by a [sic] occupant thereof. A contested proceeding subsequent is [sic] on the [Property] is a possibility and all litigation risk has been adequately disclosed to [C&M]." C&M registered the quit-claim deed on October 23, 2006.

Meanwhile, on October 17, 2006, C&M mortgaged its interest in the Property to First Minnesota for $280,000 pursuant to a preexisting line of credit that permitted C&M "to borrow funds for the purchase of properties in exchange for mortgages on the properties to First Minnesota." As part of this transaction, Michael Wayman, C&M's president, attested that "[t]here are no unrecorded contracts, leases, easements, or other agreements or interests relating to the [Property]" and that "[t]here are no persons in possession of any portion of the [Property] other than pursuant to a recorded document." First Minnesota conducted a title search on the Property before closing on the transaction. The title search would have indicated that NRV was the registered owner of the Property and that Vulcan redeemed the Property pursuant to the mortgage it received from NRV.[10] Because Plaintiff never registered the contract for deed or the

_____

> Because of the dispute regarding the redemption rights of [NRV] and the fact that the Sheriff's Office is legally prohibited from determining the rights of parties involved in such a dispute, the Sheriff's Office will not participate in the issuance of the certificate of redemption "for the holder" of the certificate of sale in this matter. Therefore, all efforts to effect a redemption from [WaMu] will have to be directed to [WaMu's counsel]. The check dropped off on behalf of [NRV] should be immediately picked up at the Civil Process Unit, since it has not been accepted in redemption on [the Property].

The letter mistakenly identifies NRV rather than Vulcan.

[10]     The title search would not have revealed Vulcan's transfer of the Property to C&M because that transfer was not registered until October 23, 2006.

warranty deed for the Property, her ownership interest was not identified on the certificate of title or the canceled certificate of title. First Minnesota registered what it believed to be a first-priority mortgage on October 23, 2006.

Plaintiff filed a Complaint dated October 23, 2006, in state court against WaMu, the McCanns, Vulcan, NRV, Edina Realty, and C&M. The Complaint sought to quiet title; asserted a breach of warranty claim against the McCanns, a slander of title claim against the McCanns, NRV, Vulcan, and C&M, and a negligence claim against Edina Realty; requested that the foreclosure sale be set aside; requested that the conveyance of the Property from the McCanns to NRV and from Vulcan to C&M be declared void pursuant to Minn. Stat. § 513.08; and sought injunctive relief prohibiting Vulcan, NRV, and C&M from possessing or owning the Property. On October 25, 2006, Plaintiff registered a notice of lis pendens on the Property's certificate of title.

Plaintiff filed an Amended Complaint on October 2, 2007, that added a claim against NRV and Vulcan pursuant to Minn. Stat. § 58.13, subd. 1(13). NRV, Vulcan, and the McCanns counterclaimed, seeking a declaration that Plaintiff has no right, title, interest, estate, or lien in or upon the Property. The McCanns also asserted a breach of contract claim against Plaintiff. NRV and Vulcan crossclaimed against WaMu, asserting wrongful foreclosure and seeking indemnification from WaMu for any liabilities it incurs to Plaintiff or C&M. C&M crossclaimed against WaMu alleging fraud and wrongful foreclosure and crossclaimed against Vulcan seeking rescission of the agreement transferring the Property from Vulcan to C&M.

In an Order dated August 15, 2007, the state court granted the joint motion of Plaintiff and WaMu to set aside the foreclosure because WaMu acted "inconsistent with an intention to treat the mortgage as terminated" by accepting payments from Plaintiff between April 2006 and

August 2006 and because Plaintiff asserted her interest in the Property by negotiating an agreement with WaMu to pay off the mortgage in full. Because the state court determined that the foreclosure on the Property was void, WaMu was required to "refund the redemption payment to NRV/Vulcan" and Plaintiff's mortgage was reinstated "on the same terms that were in place prior to the foreclosure." WaMu returned the redemption funds to Vulcan, which were eventually delivered to First Minnesota.

Plaintiff filed a Second Amended Complaint on May 20, 2008, omitting Edina Realty and the negligence claim but asserting claims against First Minnesota to quiet title, to declare void the mortgage between First Minnesota and C&M pursuant to Minn. Stat. § 513.08, and to enjoin First Minnesota from possessing or owning the Property. The Second Amended Complaint also added a claim for slander of title against WaMu. First Minnesota then moved to vacate the August 15 Order, arguing that First Minnesota was a good faith purchaser for value. In an Order dated November 19, 2008, the state court denied First Minnesota's motion as "premature" and stated that although First Minnesota "does not assert new facts or arguments that could affect [the August 15] Order, [it] may renew [its] motion if the discovery process unearths relevant and novel facts or arguments regarding [that] Order." The November 19 Order also permitted First Minnesota to file a cross-claim against WaMu. First Minnesota asserted cross-claims for breach of warranty, fraudulent misrepresentation, and promissory estoppel against WaMu.

On September 25, 2008, WaMu went out of business and the FDIC was appointed receiver of the bank, automatically succeeding to WaMu's assets and liabilities. On the same

day, Chase purchased the majority of WaMu's assets and certain of its liabilities from the FDIC through a Purchase & Assumption Agreement (P&A Agreement),[11] which provides:

> 2.1 _Liabilities Assumed by Assuming Bank_. Subject to Sections 2.5 and 4.8, [Chase] expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of [WaMu] which are reflected on the Books and Records of [WaMu] as of [September 25, 2008], including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement. . . . Notwithstanding Section 4.8, [Chase] specifically assumes all mortgage servicing rights and obligations of [WaMu].

> . . . .

> 2.5 _Borrower Claims_. Notwithstanding anything to the contrary in this Agreement, any liability associated with borrower claims for payment or liability to any borrower for monetary relief, or that provide for any other form of relief to any borrower, whether or not such liability is reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, judicial or extra-judicial, secured or unsecured, whether asserted affirmatively or defensively, related in any way to any loan or commitment to lend made by [WaMu] prior to failure, or to any loan made by a third party in connection with a loan which is or was held by [WaMu], or otherwise arising in connection with [WaMu's] lending or loan purchase activities are specifically not assumed by the bank.

> . . . .

> 4.8 _Agreement with Respect to Certain Existing Agreements_. With respect to agreements existing as of [September 25, 2008,] which provide for the rendering of services by or to [WaMu], within one hundred twenty (120) days after [September 25, 2008, Chase] shall give the [FDIC] written notice specifying whether it elects to assume or not to assume each such agreement. Except as may be otherwise provided in this Article IV, [Chase] agrees to comply with the terms of each such agreement for a period commencing on [September 26, 2008,] and ending on: (i) in the case of an agreement that provides for the rendering of services by [WaMu], the date which is ninety (90) days after [September 25, 2008,] and (ii) in the case of an agreement that provides for the rendering of

---

[11] "In a typical purchase and assumption agreement, the FDIC arranges for the sale of the bulk of a failed bank's assets and liabilities to a healthy bank." _DiVall Insured Income Fund Ltd. P'ship v. Boatmen's First Nat'l Bank of Kan. City_, 69 F.3d 1398, 1400 n.3 (8th Cir. 1995); _see also_ 12 U.S.C. § 1821(d)(2)(G)(i)(II) (2006) (permitting FDIC to transfer assets and liabilities of failed institution).

services to [WaMu], the date which is thirty (30) days after [Chase] has given notice to the [FDIC] of its election not to assume such agreement . . . . The [FDIC] agrees to assign, transfer, convey, and deliver to [Chase] all right, title and interest of the [FDIC], if any, in and to agreements [Chase] assumes hereunder.

Pursuant to 12 U.S.C. § 1821(d)(3)(B) (2006), the FDIC published notices in three newspapers on October 1, 2008, indicating that administrative claims against WaMu must be submitted to the FDIC by December 30, 2008 (claims bar date). The notices were republished in the same three newspapers on October 31, 2008, and in two of the newspapers on December 1, 2008. In addition, the FDIC mailed individual notices of the administrative claims process and claims bar date to the creditors identified in WaMu's records as of September 25, 2008. Plaintiff received a Notice to Discovered Creditor – Proof of Claim (Notice) on January 22, 2009. Plaintiff's Notice permitted her to submit a proof of claim by April 22, 2009, so long as she could prove to the FDIC's satisfaction that she had no knowledge of the appointment of the FDIC as receiver in time to file a claim by the claims bar date. Plaintiff did not file a proof of claim.

In a letter dated March 12, 2009, counsel for the FDIC[12] informed the state court and all of the parties that WaMu had "been placed in FDIC receivership." In a letter dated September 15, 2009, counsel for the FDIC notified the state court and all of the parties that the FDIC and Chase needed to be substituted for WaMu as the real parties in interest in the action. Counsel also indicated that all parties but Plaintiff would receive Notices shortly. Three days later, the McCanns, NRV, Vulcan, C&M, and First Minnesota received Notices permitting them to file proofs of claim by December 17, 2009, so long as they showed to the FDIC's satisfaction that they were unaware of the FDIC's appointment in time to file a claim before the claims bar date.

---

[12] Counsel that represented WaMu before it closed proceeded in the suit on behalf of the FDIC.

First Minnesota submitted a proof of claim dated December 2, 2009. No other Defendant submitted a proof of claim. To show First Minnesota's lack of knowledge of the appointment of the FDIC, the proof of claim identified a September 30, 2008, email exchange between counsel for First Minnesota and WaMu;[13] the March 12, 2009, letter confirming the receivership; and the September 15, 2009, letter. On December 10, 2009, the FDIC rejected First Minnesota's "request to file a claim after the bar date [because its] request does not establish that [it] did not have notice of the appointment of the receiver in time to file [its] claim by the bar date." As a result, First Minnesota's claim was automatically disallowed as untimely filed.

The FDIC removed this action to federal court pursuant to 12 U.S.C. § 1819(b) (2006) on October 27, 2009. The caption identifies the following Defendants: Chase, the FDIC as receiver for WaMu, the McCanns, Vulcan, NRV, Edina Realty,[14] C&M, and First Minnesota. On April 15, 2010, Plaintiff and First Minnesota separately moved for summary judgment and the FDIC and Chase jointly moved for summary judgment.

## II.  DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The movant "bears

---

[13]  In the email exchange, First Minnesota's counsel informed WaMu's counsel that he had received WaMu's discovery requests in the state action but wanted to know WaMu's position on whether "this action is stayed by Washington Mutual, Inc.'s bankruptcy filing" before responding. WaMu's counsel responded later that day that "[t]here are no automatic stay issues from the bankruptcy filing by the parent corp. Washington Mutual Bank, FA, the defendants [sic] in this case is not in bankruptcy."

[14]  It is unclear why Edina Realty remains in the caption as a Defendant after it was omitted from the Second Amended Complaint. The Court orders that Edina Realty be removed from the caption.

the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A.       Subject matter jurisdiction

The FDIC argues that the Court lacks subject matter jurisdiction over the claims asserted against it because the parties failed to exhaust their administrative remedies. The Financial Institutions Reform, Recovery, and Enforcement Act provides a "comprehensive claims review process for claims against the assets of failed banks held by the FDIC as receiver." *Tri-State Hotels, Inc. v. FDIC*, 79 F.3d 707, 712 (8th Cir. 1996). The process requires claimants to "initially submit their claims to the FDIC for review, thus enabling the FDIC to dispose of the bulk of claims against failed financial institutions expeditiously and fairly without unduly burdening the District Courts." *Id.* (quotation marks omitted). "[A] prospective claimant's failure to exhaust its administrative remedies under [12 U.S.C.] § 1821(d) deprives a court of subject matter jurisdiction." *RTC Mortgage Trust 1994-N2 v. Haith*, 133 F.3d 574, 578 (8th Cir. 1998).

NRV and Vulcan agree that they failed to exhaust their administrative remedies and that summary judgment in favor of the FDIC is warranted. In addition, it is undisputed that Plaintiff

and C&M did not submit claims to the FDIC, and the Court lacks subject matter jurisdiction over their claims against the FDIC.  First Minnesota, on the other hand, argues that the FDIC should be estopped from asserting that its claim was untimely because the FDIC did not mail a Notice until after the claims bar date had passed.  Binding precedent directly refutes this argument:

> [T]he FDIC's failure to provide proper notice does not relieve the claimant of the obligation to exhaust administrative remedies, because the statute does not provide for a waiver or exception under these circumstances.  The only exception to the strict requirement of exhaustion of remedies is where the claimant does not receive notice of the appointment of the receiver in time to file his claim.  This exception will only apply to the appellants if they did not receive notice of the fact of the appointment of a receiver.  The exception does not apply to claimants who are aware of the appointment of a receiver but who do not receive notice of the filing deadline.

*Id.* at 579 (citations and quotation marks omitted).  Here, First Minnesota does not assert that it was not on notice of the appointment of the FDIC as receiver for WaMu in time to file a claim before the claims bar date.  *Cf. id.* (stating that knowledge of receiving agency's "involvement" with bank sufficient to put claimant "on inquiry notice as to require further inquiry into the details of the administrative process").  Therefore, the undisputed facts establish that First Minnesota failed to exhaust its administrative remedies, and the Court lacks subject matter jurisdiction over First Minnesota's claims against the FDIC.  Accordingly, the FDIC is dismissed from this action for lack of subject matter jurisdiction.

Having concluded that the Court lacks subject matter jurisdiction over the claims asserted against the FDIC, the Court must exercise its independent obligation to ensure that it retains jurisdiction over the remaining action.  *See Sac & Fox Tribe of the Miss. in Iowa, Election Bd. v. Bureau of Indian Affairs*, 439 F.3d 832, 836 (8th Cir. 2006); *see also* 28 U.S.C. § 1447(c) (2006) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").  The FDIC removed this action pursuant to 12 U.S.C.

§ 1819(b)(2)(A), which provides that "all suits of a civil nature at common law or in equity to which the [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States." Three possibilities arise with respect to a federal court's subject matter jurisdiction when the FDIC is dismissed from an action in which federal jurisdiction arose solely because of the FDIC's presence. First, a court retains "arising under" jurisdiction over the remaining state law claims pursuant to § 1819(b)(2)(A) because the FDIC's presence effectively federalized the entire action. *See Adair v. Lease Partners, Inc.*, 587 F.3d 238, 244 (5th Cir. 2009); *FDIC v. Four Star Holding Co.*, 178 F.3d 97, 101 n.3 (2d Cir. 1999); *Fed. Sav. & Loan Ins. Corp. v. Griffin*, 935 F.2d 691, 696 (5th Cir. 1991). Second, a court lacks "arising under" jurisdiction over the remaining claims but retains the discretion to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367 (2006). *See New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1497-1511 (3d Cir. 1996). Third, a court lacks "arising under" jurisdiction over the remaining claims and must remand the action pursuant to 28 U.S.C. § 1447(c). *See id.* at 1511-15 (McKee, J., dissenting).

Were the Court writing on a clean slate, it might adopt the second approach. The United States Court of Appeals for the Eighth Circuit, however, recently adopted the first approach: "[A]ll claims in a case to which the FDIC is a party have 'arising under' federal subject matter jurisdiction. The subsequent dismissal of the claim against the FDIC [does] not defeat that jurisdiction or withdraw [a federal] court's jurisdiction over the state law claims filed against the other [parties]." *Casey v. FDIC*, 583 F.3d 586, 591 (8th Cir. 2009). Accordingly, not only does the Court retain subject matter jurisdiction, it has no discretion under 28 U.S.C. § 1441(c) (2006) to remand this action in which state law predominates. *See id.* (permitting remand of claims or causes of action that lack an independent basis for federal jurisdiction and "in which State law

predominates"); *see also Casey*, 583 F.3d at 591-92 ("We question the applicability of § 1441(c) in this context since § 1819(b)(2)(B) provides jurisdiction over the state law claims.").

## B.     Interest in the Property

First Minnesota argues that the Court should vacate the state court's August 15 Order and find that First Minnesota obtained a first-priority mortgage on the Property from C&M. Plaintiff asserts that no new facts or arguments support the Court's reconsideration of the August 15 Order and that she retains fee simple ownership of the Property subject to the WaMu mortgage that was assigned to Chase.

After removal, the August 15 Order remains binding in this Court, *see* 28 U.S.C. § 1450 (2006) ("All injunctions, orders, and other proceedings had in [a state] action prior to its removal shall remain in full force and effect until dissolved or modified by the district court."); 14C Charles Alan Wright et al., *Federal Practice and Procedure* § 3738 (2009) (noting that state court orders "remain binding on the parties unless and until formally set aside by the federal district court"), but it is "subject to reconsideration just as it had been prior to removal," *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1316 (5th Cir. 1992). *See* Fed. R. Civ. P. 54(b) ("[A]ny order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). The November 19 Order granted First Minnesota permission to renew its motion to vacate the August 15 Order "if the discovery process unearths relevant and novel facts or arguments." Accordingly, although First Minnesota did not seek reconsideration of the August 15 Order pursuant to this District's local rules, the Court addresses First Minnesota's arguments. *See* D. Minn. LR 7.1(h)

(prohibiting motions to reconsider "except by express permission of the Court, which will be granted only upon a showing of compelling circumstances").

The August 15 Order found that WaMu's acceptance of payments between April 2006 and August 2006 was "inconsistent with an intention to treat the mortgage as terminated" and "acted as a waiver of the foreclosure sale." First Minnesota argues that the discovery process revealed that WaMu did not accept and retain payments from Plaintiff during that period. The record, however, is undisputed. Plaintiff made payments on her mortgage between April 2006 and August 2006; WaMu accepted those payments and had not returned them as of late September 2006. The state court properly determined that such conduct reflected WaMu's intent to "regard[] the mortgage as still existing" and to waive its rights flowing from the foreclosure. *See Brack v. Brack*, 16 N.W.2d 557, 560-61 (Minn. 1944) ("Continued recognition of a contract as still binding after default of payment provisions is a waiver of the default and the right resulting therefrom, if any, to rescind or to declare a forfeiture on that ground."); *cf. Odegaard v. Moe*, 119 N.W.2d 281, 283-84 (Minn. 1962) (vendor's acceptance of payment during thirty-day statutory cancellation period waives the cancellation proceedings and reinstates the contract for deed); *Jandric v. Skahen*, 50 N.W.2d 625, 628 (Minn. 1951) (concluding that vendor's retention of payment for fourteen days was "sufficient evidence to support an inference that [vendor] had formed an intent to accept the payment"). Furthermore, as noted in the August 15 Order, by negotiating an agreement with WaMu to pay off the mortgage, Plaintiff asserted her interest in the Property and WaMu reflected its intent to restore Plaintiff's interest in the Property. *See Credit, Inc. v. Kutzik*, 159 N.W.2d 277, 279-80 (Minn. 1968). Because the conduct of Plaintiff and WaMu rendered the foreclosure void, no interest in the Property can flow from the foreclosure sale. In other words, Vulcan's redemption of the Property is void, Vulcan had no

interest to convey to C&M, and C&M had no interest in the Property to mortgage to First Minnesota.[15]  *See Casey v. McIntyre*, 48 N.W. 402, 403 (Minn. 1891) ("Defendant's right to redeem must depend upon a valid foreclosure.").  Accordingly, Plaintiff is the fee simple owner of the Property subject to the mortgage held by Chase.[16]

## C.    Claims against Chase

At the time the FDIC became WaMu's receiver, the following claims against WaMu remained: Plaintiff asserted a claim for slander of title; NRV and Vulcan asserted a claim for wrongful foreclosure and sought indemnification for any liability they incur to Plaintiff or C&M; C&M asserted claims for fraud and wrongful foreclosure; and First Minnesota asserted claims for breach of warranty, fraudulent misrepresentation, and promissory estoppel.  The FDIC initially assumed the potential liability associated with these claims.  Chase argues that under the plain language of section 2.5 of the P&A Agreement, "the claims for liability at issue in this case remained with the FDIC."  Alternatively, Chase argues that, even if it assumed the claims for liability in this case, those claims fail under 12 U.S.C. § 1823(e) (2006) and on their merits.

---

[15]     First Minnesota argues extensively that it "has a first lien position [on the Property] as a good faith purchaser."  *See* Minn. Stat. § 508.25 (noting that, subject to certain enumerated exceptions, "every subsequent purchaser of registered land who receives a certificate of title in good faith . . . shall hold it free from all encumbrances and adverse claims").  However, even if First Minnesota was a "good faith purchaser," that status would not create an interest in the Property where none previously existed.  *Cf. Hanson v. Kuhl*, 701 N.W.2d 257, 267 (Minn. Ct. App. 2005) (stating that where the assignment of a judgment that is later determined to be void created an illusory right to redeem, "the bona-fide-purchaser doctrine should not apply to create a title to land when there is a total absence of title in the vendor").

[16]     Chase asserts that the mortgage balance as of June 10, 2010, was $80,110.60.  Plaintiff argues that a fact issue remains as to the correct balance in light of discrepancies in WaMu's records.  The Court agrees with Plaintiff.  Accordingly, the Court declines Chase's "request for the determination of the amount of indebtedness owed by Plaintiff on the underlying mortgage transaction."

*1.     P&A Agreement*

Section 2.1 of the P&A Agreement transferred to Chase all of the liabilities reflected on WaMu's books and records except for those liabilities excluded pursuant to sections 2.5 and 4.8. Section 2.5 expressly disclaimed any liability to Chase "associated with borrower claims . . . related in any way to any loan . . . made by [WaMu] prior to failure, . . . or otherwise arising in connection with [WaMu's] lending or loan purchase activities."  Section 4.8 gave Chase the right to choose whether to assume agreements existing as of September 25, 2008, that "provide[d] for the rendering of services by or to [WaMu]."  Section 2.1, however, limited this choice by providing that, "[n]otwithstanding Section 4.8, [Chase] specifically assumes all mortgage servicing rights and obligations of [WaMu]."  Courts have construed section 2.5 together with Chase's express assumption of WaMu's mortgage servicing obligations to "'allocate [WaMu's] lender liability to the FDIC and . . . transfer [WaMu's] servicing liability to [Chase].'"  *Johnson v. Wash. Mut.*, Civ. No. 1:09-929, 2010 U.S. Dist. LEXIS 22959, at *11 (E.D. Cal. Feb. 24, 2010) (quoting *In re Pena*, 409 B.R. 847, 861 (Bankr. S.D. Tex. 2009)).  The Court agrees with such an interpretation.  This case, however, does not present a simple binary choice between lender liability and servicing liability because WaMu both owned and serviced Plaintiff's mortgage.  The issue then is whether Chase expressly assumed liability in section 2.1 or expressly disclaimed liability in section 2.5.  Although one court has suggested that section 2.5 would apply to exclude liability where WaMu owned and serviced the loan, *see In re Pena*, 409 B.R. at 861, the Court need not decide this issue because, as discussed below, even if the claims asserted against WaMu by Plaintiff, NRV, Vulcan, C&M, and First Minnesota were assumed by Chase, those claims fail on the merits.

2. *Interest diminishment*

Chase also maintains that all of the claims asserted against it are barred by 12 U.S.C. §

1823(e).  Section 1823(e) provides:

> No agreement which tends to diminish or defeat the interest of the [FDIC]
> in any asset acquired by it . . . shall be valid against the [FDIC] unless such
> agreement—
>
> (A) is in writing,
> (B) was executed by the depository institution and any person
> claiming an adverse interest thereunder . . . contemporaneously
> with the acquisition of the asset by the depository institution,
> (C) was approved by the board of directors of the depository
> institution or its loan committee, which approval shall be reflected
> in the minutes of said board or committee, and
> (D) has been, continuously, from the time of its execution, an
> official record of the depository institution.

*See also* 12 U.S.C. § 1821(d)(9) ("[A]ny agreement which does not meet the requirements set

forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim

against the receiver or the [FDIC].").[17]  Section 1823(e) codified and preempted the common law

doctrine established in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942).  *Divall Insured*

*Income Fund Ltd. P'ship v. Boatmen's First Nat'l Bank of Kan. City*, 69 F.3d 1398, 1401-02 (8th

Cir. 1995).  That doctrine barred "defenses arising from representations not evidenced in the

financial institution's official documents" in order to permit "federal and state examiners to rely

on a bank's records in evaluating the worth of the bank's assets, to encourage prudent

consideration in lending, and to assure proper recordation of banking acts to guard against

collusive or erroneous reconstruction of terms."  *Cmty. Bank of the Ozarks v. FDIC*, 984 F.2d

254, 256-57 (8th Cir. 1993).  The protections of § 1823(e) apply to the FDIC's successors in

---

[17]    The "agreement" referred to in § 1821(d)(9) is coterminous with the "agreement" referred
to in section 1823(e).  *See John v. Resolution Trust Corp.*, 39 F.3d 773, 776 (7th Cir. 1994).

interest.  *See id.* at 257; *see also FDIC v. Newhart*, 892 F.2d 47, 50 (8th Cir. 1989) ("[T]he FDIC transfers its protected status to subsequent purchasers of notes it holds.").

More than one year before WaMu's failure and Chase's assumption of most of its assets, the state court set aside the foreclosure.  Thus, the interest Chase assumed through the P&A Agreement was a mortgage on the Property.  According to Chase, the relevant agreement that tends to diminish or defeat that interest is the "tacit agreement" between Plaintiff and WaMu that was created when Plaintiff made and WaMu accepted payments on the mortgage between April 2006 and August 2006.  This "tacit agreement," however, restored the interest that Chase assumed; it did not "diminish or defeat" that interest.  *Cf. Kessler v. Nat'l Enters., Inc.*, 165 F.3d 596, 599 (8th Cir. 1999) ("The interest RTC acquired through the mortgage was a security interest in the Developer's collateral.  That security interest has not been diminished—for example, by an undisclosed superior lien—and it cannot be diminished by plaintiffs' claims.").  Accordingly, § 1823(e) is inapplicable to the claims asserted against Chase.

3.      *Substantive claims*

Finally, assuming that the P&A Agreement transferred to Chase the liability associated with the claims brought by Plaintiff, NRV, Vulcan, C&M, and First Minnesota, Chase argues that those claims fail on their merits.  For the reasons discussed below, the Court agrees.

a.      *Slander of title*

Plaintiff asserts a claim for slander of title against WaMu.  A claim for slander of title requires proof of four elements: (1) a false statement concerning the real property owned by the plaintiff; (2) publication of the false statement to others; (3) publication of the false statement with malice; and (4) publication of the false statement concerning title to the property caused the plaintiff pecuniary loss in the form of special damages.  *Paidar v. Hughes*, 615 N.W.2d 276,

279-80 (Minn. 2000). "The filing of an instrument known to be inoperative is a false statement that, if done maliciously, constitutes slander of title." *Id.* at 280. "The element of malice requires a reckless disregard concerning the truth or falsity of a matter despite a high degree of awareness of probable falsity or entertaining doubts as to its truth." *Brickner v. One Land Dev. Co.*, 742 N.W.2d 706, 711-12 (Minn. Ct. App. 2007) (quotation marks omitted). Attorney fees incurred to remove a cloud on title constitute special damages in a slander of title action. *Paidar*, 615 N.W.2d at 280.

Chase first argues that no facts support a finding that WaMu made a false statement. Plaintiff identifies the following three allegedly false statements made by WaMu: (1) filing a February 10, 2006, power of attorney and notice of foreclosure despite having accepted payments on the mortgage on February 6, 2006; (2) filing the certificate of sheriff's sale on April 6, 2006; and (3) causing to be published weekly in a newspaper a notice of mortgage foreclosure sale with respect to the Property for five consecutive weeks beginning on February 2, 2006, and ending on March 23, 2006. At the time of these allegedly false statements, WaMu had not acted inconsistent with its right to foreclose. Specifically, Plaintiff was in default on the mortgage and WaMu returned Plaintiff's February 6, 2006, payments almost immediately. By promptly returning the payments, WaMu acted consistently with its intent to treat the mortgage as in default. Therefore, at the time WaMu made the allegedly false statements, foreclosure on the Property was proper and the statements were not false. WaMu waived the foreclosure only after failing to timely return the payments that Plaintiff tendered from April 2006 to August 2006. Accordingly, because Plaintiff has identified no false statement by WaMu, summary judgment in favor of Chase is warranted on her claim for slander of title.

b.      *Wrongful foreclosure*

NRV, Vulcan, and C&M each assert claims for wrongful foreclosure against WaMu. WaMu, however, never foreclosed on any mortgages held by these Defendants, and they lack standing to challenge the foreclosure of Plaintiff's mortgage. *Cf. First Trust Co. v. Leibman*, 430 N.W.2d 257, 261 (Minn. Ct. App. 1988) (holding that mortgagor had no standing to assert deficiencies in foreclosure proceedings as to co-mortgagor), *rev'd on other grounds*, 445 N.W.2d 547 (Minn. 1989). Accordingly, the Court grants summary judgment in favor of Chase on the wrongful foreclosure claims.

c.      *Fraud*

C&M and First Minnesota assert claims for fraud against WaMu based on alleged representations in the notice of foreclosure sale and the certificate of sale. As discussed above, WaMu's representations before and at the time of the foreclosure sale were accurate. Therefore, because C&M and First Minnesota have not identified a misrepresentation, *see Heidbreder v. Carton*, 645 N.W.2d 355, 367 (Minn. 2002) (noting claim for fraud requires proof of a false representation of present fact), summary judgment in favor of Chase on the claims for fraud is warranted.

d.      *Breach of warranty*

First Minnesota asserts a claim for breach of warranty against WaMu, alleging that the certificate of redemption was issued by the Sheriff at WaMu's insistence and that the certificate "constitutes a warranty of title." First Minnesota has cited no authority, and the Court is aware of none, to support this proposition. Accordingly, the Court grants summary judgment in favor of Chase on First Minnesota's claim for breach of warranty.

*e.* *Promissory estoppel*

Finally, First Minnesota asserts a claim for promissory estoppel against WaMu. First Minnesota, however, has not identified any specific promises upon which it relied. *See Hous. & Redev. Auth. of Chisholm v. Norman*, 696 N.W.2d 329, 336 (Minn. 2005) (noting that claim for promissory estoppel requires proof of a clear and definite promise). Instead, First Minnesota generally alleges that WaMu "made promises to members of the public including First Minnesota by virtue of its foreclosure." First Minnesota's failure to specify any evidence supporting this general allegation warrants the entry of summary judgment on this claim. Therefore, the Court grants Chase's motion for summary judgment as to First Minnesota's claim for promissory estoppel.

## III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 10] is GRANTED.

2.    First Minnesota's Motion for Summary Judgment [Docket No. 16] is DENIED.

3.    Plaintiff is the fee simple owner of the Property subject to the mortgage held by Chase.

4.    The Joint Motion of the FDIC and Chase for Summary Judgment [Docket No. 18] is GRANTED IN PART.

5.    The claims against the FDIC are DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction.

6.    The claims against Chase are DISMISSED WITH PREJUDICE.

7.    The amount Plaintiff owes Chase under the mortgage remains unresolved.

8.      The Motion of the McCanns, NRV, and Vulcan for Summary Judgment
        [Docket No. 34] is DENIED as untimely.

9.      Edina Realty shall be stricken from the caption.

10.     The Court declines to address any issues with respect to attorney fees until
        such time as the claims of all parties have been resolved.

Dated:  July 14, 2010

                                        s/  Joan N. Ericksen
                                        JOAN N. ERICKSEN
                                        United States District Judge